COURT OF APPEALS
DECISION
DATED AND FILED

September 26, 2019

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No.  2018AP1887**

**STATE OF WISCONSIN**

Cir. Ct. No.  2017ME44

**IN COURT OF APPEALS
DISTRICT IV**

IN THE MATTER OF THE MENTAL COMMITMENT OF K. E. K.:

WAUPACA COUNTY,

      PETITIONER-RESPONDENT,

  V.

K. E. K.,

      RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Waupaca County: VICKI L. CLUSSMAN, Judge.  *Affirmed.*

Before Fitzpatrick, P.J., Blanchard, and Graham, JJ.

¶1 BLANCHARD, J.[1] K.E.K. appeals two decisions of the circuit court: one to extend K.E.K.'s involuntary commitment and the other requiring involuntary medication and treatment. In challenging the order extending her commitment, K.E.K. argues that (1) the circuit court lacked competency to order involuntary recommitment because Waupaca County filed the petition after the time required by WIS. STAT. § 51.20(13)(g)2r. and (2) the recommitment paragraph, § 51.20(1)(am), is unconstitutional, both facially and as applied to K.E.K., on both vagueness and due process grounds. Regarding the ruling requiring involuntary medication and treatment, K.E.K. argues that the circuit court erred by failing to identify supporting statutory grounds and that the evidence is insufficient. We reject all of K.E.K.'s arguments and affirm.

## Background

¶2 On November 22, 2017, the County filed an initial petition for examination seeking to commit K.E.K. under WIS. STAT. § 51.20(1)(a), more specifically under § 51.20(1)(a)2.e., known as the "fifth standard" of dangerousness. *See State v. Dennis H.*, 2002 WI 104, ¶¶14, 33, 255 Wis. 2d 359, 647 N.W.2d 851 (fifth standard permits commitment of "mentally ill persons whose mental illness renders them incapable of making informed medication decisions and makes it substantially probable that, without treatment, disability or deterioration will result"). On December 8, 2017, following a jury trial, the circuit court entered an order committing K.E.K. for six months. On May 22, 2018, the

---

[1] This appeal was converted from a one-judge appeal to a three-judge appeal under WIS. STAT. RULE 809.41(3) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

County filed an evaluation, recommendation, and petition for recommitment seeking to extend K.E.K.'s commitment for an additional twelve months.[2]

¶3    K.E.K. filed a motion to dismiss the County's petition for recommitment on the ground that the circuit court lacked competency to proceed, because the County violated a statutory requirement under WIS. STAT. § 51.20(13)(g)2r.  Specifically, the County failed to follow the requirement that petitions for recommitment must be filed at least 21 days before the expiration of the initial commitment.  *See* § 51.20(13)(g)2r.  The County conceded that it had filed only 17 days prior to expiration of K.E.K.'s original commitment order.  The circuit court denied K.E.K.'s timeliness motion.

¶4    Separately, K.E.K. argued that, in order to satisfy due process requirements for recommitment, the County was required to establish that K.E.K. had engaged in a recent act supporting a new or continuing finding of dangerousness.  K.E.K. further contended that WIS. STAT. § 51.20(1)(am) is unconstitutionally vague because it fails to define a key phrase contained within that paragraph, namely, "would be a proper subject for commitment if treatment were withdrawn," and there is no definition of that phrase in statutes or in case law.  The circuit court rejected these arguments, concluding that the County was not required to present evidence of a recent act supporting a finding of dangerousness to meet its burden to establish that recommitment was appropriate.  The court also at least implicitly concluded that § 51.20(1)(am) is not unconstitutionally vague.

_____

[2] WISCONSIN STAT. § 51.20, as well as case law, uses the terms "recommitment" and "extension of a commitment" interchangeably.  *See Portage Cty. v. J.W.K.*, 2019 WI 54, ¶1 n.1, 386 Wis. 2d 672, 927 N.W.2d 509.  We will generally use "recommitment."

¶5      The County's request for recommitment was tried to the court. We recount trial testimony as necessary to discussion below.

¶6      The circuit court found that K.E.K. was mentally ill and that there was a substantial likelihood that she would be a proper subject for commitment if treatment were withdrawn. The court issued an order extending K.E.K.'s involuntary commitment for the maximum period of twelve months. In addition, the court ordered involuntary medication and treatment during the period of recommitment. K.E.K. now appeals.

### *Discussion*

¶7      We begin by addressing K.E.K.'s statutory and constitutional arguments regarding the recommitment order. After that, we address K.E.K.'s argument that there was insufficient evidence to support the court's involuntary treatment and medication order.[3]

---

[3] Given the timing of this decision, K.E.K.'s appeal of the recommitment and medication and treatment orders appears to be moot. *See **J.W.K.***, 386 Wis. 2d 672, ¶14 ("An appeal of an expired commitment order is moot."). We may consider moot issues if they fall within exceptions to the rule that moot appeals are generally dismissed. *See id.*, ¶29 (listing several mootness exceptions including, for example, "'the constitutionality of a statute,'" and "an issue 'capable and likely of repetition and yet evades review because the appellate process usually cannot be completed and frequently cannot even be undertaken within a time that would result in a practical effect upon the parties.'") (alterations and quoted source omitted); *see also **Outagamie Cty. v. Melanie L.***, 2013 WI 67, ¶80, 349 Wis. 2d 148, 833 N.W.2d 607 (addressing moot appeal of involuntary medication and treatment order based on multiple exceptions). The parties do not address the issue of mootness or the exceptions to dismissing moot appeals. We conclude that each of K.E.K.'s arguments sufficiently implicate one or more of the exceptions to mootness to warrant addressing her arguments on the merits.

## I. The Recommitment Order

### A. Whether the Circuit Court Lacked Competency

¶8      Our resolution of K.E.K.'s argument that the circuit court lacked competency turns on the proper interpretation of WIS. STAT. § 51.20(13)(g)2r. The construction of a statute is a question of law that appellate courts review without deference to the circuit court.  *DeMars v. LaPour*, 123 Wis. 2d 366, 370, 366 N.W.2d 891 (1985).  Courts first determine whether the statutory language has plain meaning.  *See State ex rel. Kalal v. Circuit Court for Dane Cty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110.  In addition, "statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results."  *Id.*, ¶46.  "Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage." *Id.*

¶9      WISCONSIN STAT. § 51.20 governs relatively short term involuntary commitments and recommitments.  *Fond du Lac Cty. v. Helen E.F.*, 2012 WI 50, ¶29, 340 Wis. 2d 500, 814 N.W.2d 179 ("[WIS. STAT.] ch. 51 is used for short term treatment and rehabilitation intended to culminate with re-integration of the committed individual into society," as opposed to WIS. STAT. ch. 55, which governs long-term care).

¶10     When a governmental entity (here, the County) seeks the recommitment of an individual already committed pursuant to WIS. STAT. ch. 51, the government must file an "evaluation ... and ... recommendation" at least 21

days before the expiration of the previously imposed commitment.[4] *See* WIS. STAT. § 51.20(13)(g)2r. Here, it is undisputed that, under this 21-day rule, the County filed its recommitment petition after the time set forth in the statute.

¶11 K.E.K. argues that the County's failure to meet the 21-day requirement deprived the circuit court of "competency" and, therefore, the recommitment order must be vacated. Specifically, K.E.K. argues that when a petitioner violates the mandatory directive that it "shall file" a recommitment petition "[t]wenty-one days prior to expiration of the period of commitment" found in WIS. STAT. § 51.20(13)(g)2r., this deprives the circuit court of competency to address the recommitment petition. The dispute here centers on the subdivision's later directive that "[a] failure ... to file an evaluation and recommendation under this subdivision does not affect the jurisdiction of the court over a petition for recommitment." The issue is whether this directive preserves court jurisdiction, but not court competency. *See* § 51.20(13)(g)2r. According to K.E.K., because this directive pertains to jurisdiction, it has no effect on competency. K.E.K. points out that cases such as *City of Eau Claire v. Booth*, 2016 WI 65, 370 Wis. 2d 595, 882 N.W.2d 738, make clear that "jurisdiction" and "competency" are distinct concepts.

¶12 The County argues that the "jurisdiction" language in WIS. STAT. § 51.20(13)(g)2r. would be rendered meaningless by K.E.K.'s interpretation. According to the County, it would make no sense for the legislature to include

---

[4] There appears to be no dispute that the "evaluation ... and ... recommendation" referred to in WIS. STAT. § 51.20(13)(g)2r. may also be properly referred to as a "recommitment petition." *See* § 51.20(13)(g)2r. (using the phrase "petition for recommitment" as an apparent substitute for the somewhat cumbersome phrase "an evaluation of the individual and the recommendation of the department or county department regarding the individual's recommitment").

6

language preserving a court's jurisdiction if a late filing would cause the court to lose competency to act. That is, we understand the County to argue that K.E.K.'s interpretation is absurd, because the preservation of jurisdiction has no meaning if a court were to lose competency to do anything pursuant to that preserved jurisdiction.

¶13 In our view, K.E.K.'s argument assumes that the legislature's use of the term "jurisdiction" is consistent with the case law distinction between "jurisdiction" and "competency." As we now explain, we conclude that the only reasonable reading of "does not affect the jurisdiction of the court" is that courts retain competency to exercise jurisdiction. As a result, a petitioner's failure to comply with the 21-day filing time limit does not affect the court's competency to exercise jurisdiction.

¶14 K.E.K. is correct that precedent such as **Booth** explains that jurisdiction is distinct from competency. However, **Booth** also explains that subject matter jurisdiction is conferred by the Wisconsin Constitution and may not be curtailed by the legislature. The legislature may curtail the courts' competency to *exercise* jurisdiction in defined circumstances:

> Article VII, Section 8 of the Wisconsin Constitution provides, in pertinent part: "Except as otherwise provided by law, the circuit court shall have original jurisdiction in all matters civil and criminal within this state ...." Subject matter jurisdiction, established by this section of our constitution, "refers to the power of a court to decide certain types of actions." Because this power is granted to circuit courts by our constitution, it cannot be "curtailed by state statute." *However, "a circuit court's ability to exercise the subject matter jurisdiction vested in it by the constitution may be affected by noncompliance with statutory requirements pertaining to the invocation of that jurisdiction in individual cases."* Noncompliance with statutory mandates affects a court's competency and "a court's 'competency,' as the term is understood in

7

> Wisconsin, is not jurisdictional at all, but instead, is defined as 'the power of a court to exercise its subject matter jurisdiction' in a particular case."

***Booth***, 370 Wis. 2d 595, ¶7 (emphasis added; citations omitted).  Thus, subject matter jurisdiction is conferred on our courts by our constitution and our legislature is powerless to confer or restrict such jurisdiction.  It follows that, when the legislature provides that a petitioner's failure to observe the 21-day window to file "does not affect the jurisdiction of the court," it could not mean to address whether the circuit court does or does not have jurisdiction.[5]

¶15   For these reasons, the only reasonable reading of "does not affect the jurisdiction of the court" is that a failure to comply with the 21-day filing time limit does not affect a court's competency to *exercise* jurisdiction.  Stated in the words of ***Booth***, "[n]oncompliance with statutory mandates affects a court's competency" to "exercise the subject matter jurisdiction vested in [the court] by the constitution." ***Id.***

¶16   Notably, although K.E.K. accurately describes the difference between jurisdiction and competency, she does not provide any alternative interpretation of "does not affect the jurisdiction of the court."  If, as K.E.K. contends, the phrase solely implicates jurisdiction, and if, as ***Booth*** explains, the legislature is powerless to confer or restrict jurisdiction, what else could the phrase mean?  K.E.K. does not provide an answer, and we discern none.

---

[5] It appears that the parties to agree that the phrase "jurisdiction of the court" in WIS. STAT. § 51.20(13)(g)2r. refers to *subject matter* jurisdiction of the court.  K.E.K. acknowledges as much when she references subject matter jurisdiction while relying on a paragraph in ***Booth*** that discusses subject matter jurisdiction and competency.  *See **City of Eau Claire v. Booth***, 2016 WI 65, ¶7, 370 Wis. 2d 595, 882 N.W.2d 738.

¶17 Accordingly, we agree with the circuit court that WIS. STAT. § 51.20(13)(g)2r. directs that a petitioner's failure to comply with the 21-day filing time limit does not affect a court's competency to exercise jurisdiction and, therefore, the circuit court here did not lose competency when the County filed the K.E.K. recommitment petition fewer than 21 days before expiration of the initial commitment.

## B. Facial Constitutional Challenges

¶18 K.E.K. argues that part of the recommitment criteria in WIS. STAT. ch. 51 is unconstitutional because it violates substantive due process and is void for vagueness. The arguments hinge, or largely hinge, on the proposition that a portion of WIS. STAT. § 51.20(1)(am), addressing recommitments, is unclear. We disagree based on the following statutory interpretation discussion. After clarifying the meaning of the disputed language, we return to K.E.K.'s constitutional arguments.

### 1. The Meaning Of The Recommitment Subsection

¶19 K.E.K. argues that one part of the criteria found in WIS. STAT. § 51.20(1)(am) for the recommitment of an individual is hopelessly unclear. This is the criterion that "there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn." We put that phrase in context, and then explain why we disagree with K.E.K.'s arguments.

¶20 The recommitment paragraph, WIS. STAT. § 51.20(1)(am), must be read together with the initial commitment paragraph, § 51.20(1)(a). Under WIS. STAT. ch. 51, a court may order an initial commitment if an individual is:

(1) mentally ill (required by § 51.20(1)(a)1.),[6]

(2) a proper subject for treatment (also required by § 51.20(1)(a)1., and

(3) dangerous under one of the five alternative dangerousness standards (set forth in five subdivision paragraphs, § 51.20(1)(a)2.a.-e.).

*See* § 51.20(1)(a); WIS JI—CIVIL 7050. In evaluating the third prong of this test, each of the five dangerousness standards include a requirement of a recent act, for example, issuing threats or attempting suicide. *See* § 51.20(1)(a)2.a.-e. (example from subd. para. a.).

¶21 Turning to recommitment, before a committed individual whose initial commitment has not yet expired may be recommitted, the court must find that the same standards are met. S*ee **Portage Cty. v. J.W.K.***, 2019 WI 54, ¶18, 386 Wis. 2d 672, 927 N.W.2d 509 (a petitioner seeking recommitment must "prove the same elements by clear and convincing evidence: (1) the individual is mentally ill and a proper subject for treatment, and (2) the individual is dangerous.") (citing WIS. STAT. § 51.20(1)(a), (am)). The only material difference between initial commitment and recommitment in this context is that, if the individual has been treated for a mental illness as the result of a § 51.20(1) commitment, meeting the third prong of the test no longer necessarily requires proof of a recent act and, instead, may be satisfied by a showing "that there is a substantial likelihood, based on the subject individual's treatment record, that the

---

[6] Following the parties' lead, we use "mentally ill" as shorthand for "mentally ill, developmentally disabled, or drug dependent." *See* WIS. STAT. § 51.20(1)(am). We note that, at least in some case law, what we now list as prongs one and two of the commitment test are described as a single "element." *See e.g.*, *J.W.K.*, 386 Wis. 2d 672, ¶18, ("(1) the individual is mentally ill and a proper subject for treatment, and (2) the individual is dangerous").

individual would be a proper subject for commitment if treatment were withdrawn." Sec. 51.20(1)(am). This is the language that K.E.K. argues is unclear.

¶22 K.E.K.'s argument fails, because this language means the following: a petitioner seeking recommitment may, as an alternative to establishing one of the five grounds for dangerousness through recent acts, establish one of those grounds by proving a "substantial likelihood" that, if current "treatment were withdrawn," the "individual would be a proper subject for commitment" under the test applicable to initial commitments. *See **J.W.K.***, 386 Wis. 2d 672, ¶¶18-19, 23-24 (describing WIS. STAT. § 51.20(1)(am) as an alternate evidentiary path to establish a substantial likelihood that behaviors and acts manifesting dangerousness would be exhibited if treatment were withdrawn). This is true for the following reasons.

¶23 First, it is undisputed, and not subject to reasonable dispute, that the phrase "the individual would be a proper subject for commitment" in WIS. STAT. § 51.20(1)(am) is a reference to an initial commitment—that is, the individual up for potential recommitment could be properly committed a first time. We cannot discern what other "commitment" § 51.20(1)(am) could be referring to. Thus, the requirement that an individual "be a proper subject for commitment" for recommitment purposes means that, if treatment were withdrawn, the individual would be a proper subject for commitment under the test for an initial commitment described above: mentally ill, a proper subject for treatment, and dangerous.

¶24 Second, language in WIS. STAT. § 51.20(1)(am) that we have not quoted to this point further demonstrates that this provision is connected to each of the five dangerousness standards described in subd. (1)(a)2. Specifically, the language immediately preceding the disputed clause refers to each type of recent

11

act evidence corresponding to each dangerousness standard in describing how para. (1)(am) provides an alternative means to meet each of the five standards in the recommitment context.[7]

¶25    Third, it is clear that the phrase in WIS. STAT. § 51.20(1)(am), "the individual would be a proper subject for commitment," means that recommitment requires a finding that, if treatment were withdrawn, there is a substantial probability that the individual would be dangerous under at least one of the five alternative dangerousness standards in the initial commitment test.  This is because, once more, there is no other reasonable reading of the language.  K.E.K. proposes two alternatives, but we conclude that neither is reasonable.

¶26    K.E.K. suggests that this phrase means that a petitioner "is relieved of proving dangerousness at all."  We disagree.  The phrase has the evident meaning that we have just explained.  And, our supreme court has made clear that WIS. STAT. § 51.20(1)(am) requires a finding of dangerousness in the recommitment setting, just as § 51.20(1)(a) requires a finding of dangerousness in the initial commitment setting.  *See* *J.W.K.*, 386 Wis. 2d 672, ¶¶18-19, 23-24.

---

[7] The following is a more complete quote:

> [T]he requirements of a recent overt act, attempt or threat to act under par. (a)2.a. or b., pattern of recent acts or omissions under par. (a)2.c. or e., or recent behavior under par. (a)2.d. may be satisfied by a showing that there is a substantial likelihood, based on the subject individual's treatment record, that the individual would be a proper subject for commitment if treatment were withdrawn.

WIS. STAT. § 51.20(1)(am).

12

¶27   K.E.K. also suggests that this phrase requires proof supporting the particular dangerousness standard—*i.e.*, the same one of the five alternative dangerousness standards—used for the individual's initial commitment.   We disagree.   No language in WIS. STAT. § 51.20(1)(am) suggests such a limitation. The paragraph says "a proper subject for commitment" and does not say anything to the following effect:   "a proper subject for commitment looking to the same dangerousness standard relied on during the initial commitment."

¶28   In sum, we agree with the brief filed by the attorney general, which states that it "is clear from the plain language of" WIS. STAT. § 51.20(1) that "[t]o prove dangerousness—either initially or on extension—the government must show that the individual would [evince] one of the five standards of dangerousness if treatment were withdrawn."[8]

¶29   Our discussion above resolves K.E.K.'s primary argument regarding the clarity of WIS. STAT. § 51.20(1)(am).   Nonetheless, we choose to address another supporting argument in K.E.K.'s brief-in-chief.

¶30    K.E.K. asserts that, "[i]n lieu of [the five alternate dangerousness standards], WIS. STAT. § 51.20(1)(am) substitutes a lower, undefined threshold: 'would be a proper subject for commitment if treatment were  withdrawn.'" This appears to misread § 51.20(1)(am) as fully displacing the dangerousness requirements in § 51.20(1)(a)2.   Rather, § 51.20(1)(am) has the effect of adding a

---

[8] This quote from the attorney general's brief shows that K.E.K. is wrong when she contends that "[t]he Attorney General does not say whether, at the recommitment stage, the County must prove that withdrawing treatment would cause K.E.K. to become dangerous under the same standard used to justify her original commitment or simply any standard of dangerousness."

means by which dangerousness may be established in the recommitment context by modifying the type of proof that may be used to establish dangerousness under the five standards. *See J.W.K.*, 386 Wis. 2d 672, ¶19. That is not a lower or undefined non-dangerousness standard. It is a coherent way of defining dangerousness when current treatment may be preventing dangerous behavior.

¶31 To sum up, K.E.K. fails to demonstrate that the disputed phrase in the recommitment subsection is unclear. It has clear meaning. The party seeking a recommitment order must prove a "substantial likelihood" that, if current "treatment were withdrawn," the "individual would be a proper subject for commitment" under the test applicable to initial commitments. We turn to K.E.K.'s facial constitutional challenges.

### 2. Facial Constitutional Challenge: Void For Vagueness

¶32 Having rejected K.E.K.'s argument that the meaning of the recommitment standard in WIS. STAT. § 51.20(1)(am) is unclear, it follows that her void for vagueness argument must fail. That is, we have established that § 51.20(1)(am) has a clear meaning and therefore it cannot be true that the statute is "'so obscure'" that individuals of "'common intelligence must necessarily guess at its meaning and differ as to its applicability.'" *Dennis H.*, 255 Wis. 2d 359, ¶26 (quoting *State v. Curiel*, 227 Wis. 2d 389, 414-15, 597 N.W.2d 697 (1999)).

### 3. Facial Constitutional Challenge: Substantive Due Process Requirement Of Dangerousness

¶33 K.E.K. and the attorney general agree that, to satisfy substantive due process, a commitment or recommitment pursuant to WIS. STAT. § 51.20(1) must be supported by a showing that the individual is both mentally ill and dangerous to self or others. This agreement flows from several cases. *See*, *e.g.*, *Foucha v.*

*Louisiana*, 504 U.S. 71, 78 (1992) ("[K]eeping Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness."); ***Dennis H.***, 255 Wis. 2d 359, ¶¶13, 31, 36 (the government does not have a legitimate interest in confining individuals who are not mentally ill or who do not pose a danger to themselves or others).

¶34     However, citing ***O'Connor v. Donaldson***, 422 U.S. 563, 575-76 (1975), K.E.K. contends that substantive due process specifically requires a determination of *current* dangerousness to justify recommitment, as distinct from a determination of a risk of future dangerousness or dangerousness that is contingent on events that have not yet come to pass.  K.E.K. argues that WIS. STAT. § 51.20(1)(am) fails to require a determination of current dangerousness because it "authorizes the involuntary commitment of a mentally ill person who is not dangerous to himself or others" at the time of the court's recommitment decision.

¶35     We explain below why we conclude that K.E.K.'s argument fails because it is based on the flawed proposition that *current* dangerousness can be shown only by proof of *recent* behavior exhibiting dangerousness.  In addition, her argument is precluded by decisions of our supreme court.  We first note our agreement with two points that K.E.K. makes, and then turn to what we consider flawed reasoning and to case law that forecloses her argument.

¶36     The County and the attorney general seem to suggest that K.E.K.'s due process argument is rebutted by the explanation in case law that the purpose of WIS. STAT. § 51.20(1)(am) is to avoid a "revolving door."  *See **State v. W.R.B.**, 140 Wis. 2d 347, 411 N.W.2d 142 (Ct. App. 1987).  We disagree.  Briefly stated, **W.R.B.** explains that the recommitment standard is needed to prevent a "revolving

door" of commitment-release-commitment, etc., in light of the following potential problem: it is often not possible in the recommitment context for the petitioner to meet the dangerousness standards applicable to initial commitments precisely because a currently committed individual is being successfully treated. *See id.* at 351-52. While the court clearly explains the nature of a potential revolving door problem, we agree with K.E.K. that *W.R.B.*'s explanation does not address whether the legislature adopted a *constitutional means* of addressing the potential problem.

¶37   We also agree with K.E.K. that WIS. STAT. § 51.20(1)(am) does not require proof of *recent acts* of dangerousness. However, we do not agree that this means that the subsection does not require proof of *current* dangerousness.

¶38   Both WIS. STAT. § 51.20(1)(a) (initial commitments) and § 51.20(1)(am) (recommitments) require a showing of *current* dangerousness, although neither requires a showing that individuals actually harmed themselves or others. Both paragraphs speak in terms of the presently existing probability or likelihood that individuals will harm themselves or others in the future. *See* § 51.20(1)(a) (using "substantial probability" language); § 51.20(1)(am) (using "substantial likelihood" language).[9] Both paragraphs impose, in different ways, the same burden on the government. The government must prove that there is a substantial probability or a substantial likelihood that subject individuals will harm themselves or others in the absence of treatment. In the words of the attorney general, "whether the government uses a 'recent overt act' or the consequences of

_____

[9] K.E.K. does not suggest that there are any constitutional implications to the difference between "substantial probability" and "substantial likelihood."

withdrawing treatment to prove dangerousness, the dangerousness being proved is current dangerousness."[10]

¶39 This rationale is consistent with statements by our supreme court. The court has made clear that WIS. STAT. § 51.20(1)(am) "provides a different avenue for proving dangerousness if the individual has been the subject of treatment for mental illness immediately prior to" recommitment proceedings. *J.W.K.*, 386 Wis. 2d 672, ¶19. The court has further noted that "[e]ach extension hearing requires proof of *current* dangerousness," *id.*, ¶24 (alteration in original), whether proven through one of the five alternate standards of dangerousness using recent acts or through § 51.20(1)(am), *J.W.K.*, 386 Wis. 2d 672, ¶18. *See also Waukesha Cty. v. J.W.J.*, 2017 WI 57, ¶20, 375 Wis. 2d 542, 895 N.W.2d 783 (referring to WIS. STAT. § 51.20(1)(am) as a means of "satisfy[ing] the 'dangerousness' prong").

¶40 K.E.K. further contends that her assertion that WIS. STAT. § 51.20(1)(am) does not require proof of current dangerousness is exemplified by the purported holding of a one-judge opinion, *Waukesha Cty. v. Kathleen R.H.*, 2010AP2571-FT, unpublished slip op. (WI App Feb. 23, 2011). According to K.E.K., this opinion "hold[s] that §51.20(1)(am) does not require proof that withdrawing treatment would result in dangerousness." We disagree. Nowhere does the opinion say that WIS. STAT. § 51.20(1)(am) does not require such proof.

_____

[10] We observe that, even if a presently accurate showing of future dangerousness could be said to be distinct from a showing of current dangerousness, the former showing may satisfy substantive due process requirements under certain circumstances. *See Kansas v. Hendricks*, 521 U.S. 346, 358, 360 (1997) (upholding state law based on its requiring "a finding of future dangerousness," where that finding is "link[ed] … to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior").

Rather, the opinion disposes of the notion that proof that the individual in that case "would be a danger to herself or others if treatment were withdrawn" did not need to be supplied by proof "apart from that contained in her treatment record." *See Kathleen R.H.*, 2010AP2571-FT, ¶8.

### C. As-Applied Challenges To Constitutionality

#### 1. As-Applied: Void For Vagueness

¶41    K.E.K.'s brief-in-chief has a subsection purporting to demonstrate that, even if WIS. STAT. § 51.20(1)(am) is not unconstitutionally vague on its face, it is unconstitutionally vague as applied to her. However, we do not discern a recognizable as-applied vagueness argument in this section of K.E.K.'s brief.

¶42    K.E.K. first points to testimony supporting the view that she would not be dangerous to herself if she were not recommitted, and asks "[w]hat more could [she] do to avoid endless recommitments?" This appears to be an illustration of K.E.K.'s facial vagueness argument, not an as-applied vagueness argument. Moreover, we note that K.E.K.'s question misapprehends the pertinent inquiry in the assessment of whether the standards governing recommitment hearings are unconstitutionally vague. The issue is not whether K.E.K. is able to avoid recommitment. Circumstances outside her control, including mental illness, may make it impossible for her to avoid recommitment. The issue is whether someone of normal intelligence would understand the circumstances under which an individual is subject to recommitment under WIS. STAT. § 51.20(1)(am), when read together with § 51.20(1)(a). We have already addressed this issue and determined that the statute is not unclear.

¶43 K.E.K. next asserts that "separate actors [in this proceeding] interpret[ed] [WIS. STAT.] § 51.20(1)(am) differently." She describes what she contends are statements demonstrating differing statutory interpretations made by witnesses, the County's attorney, and the circuit court. This again could be an illustration of K.E.K.'s facial vagueness argument, not an as-applied vagueness argument. Alternatively, such subjective views of what is required under WIS. STAT. § 51.20(1)(am) might be a basis for arguing that the circuit court applied an incorrect standard of law.[11] However, the views do not support an as-applied vagueness argument.

¶44 To the extent that K.E.K. points to these allegedly differing views to support her argument that the meaning of WIS. STAT. § 51.20(1)(am) is unclear, this adds nothing to her facial vagueness challenge.

¶45 For these reasons, we reject K.E.K.'s as-applied vagueness argument.

2. As-Applied: Substantive Due Process Requirement Of Dangerousness

¶46 K.E.K. argues that, even if WIS. STAT. § 51.20(1)(am) does not violate substantive due process on its face, the statute violates substantive due process as applied to her. She provides three supporting arguments. We address and reject each.

---

[11] K.E.K. does not develop an argument, as an alternative to her challenges to the constitutionality of WIS. STAT. § 51.20(1)(am), that the circuit court applied the incorrect standards under the statute.

¶47    First, K.E.K. argues that the County was required to prove that she was currently dangerous, but that the circuit court found credible testimony supporting the view that K.E.K. was *not* currently dangerous to herself or others. We fail to understand in what sense this is an as-applied substantive due process argument. Regardless, the argument is meritless. It is based on either of two incorrect premises: that substantive due process cannot be satisfied by a current finding of future or contingent dangerousness, or that such dangerousness cannot be proven if there is no evidence of recent behavior showing dangerousness.

¶48    K.E.K. points to testimony and a finding by the circuit court here that both address K.E.K.'s status *while under treatment*. However, as we have explained, the recommitment dangerousness question is not necessarily whether K.E.K. has engaged in recent acts suggesting dangerousness. Instead, the question may be, as the circuit court stated here: "whether or not at this point, if treatment was withdrawn, [K.E.K.] would then become a proper subject for a new commitment" because she would then pose a danger to herself or others.

¶49    Second, K.E.K. argues that "at the recommitment trial the County did not offer any evidence—in particular, any treatment records from her original commitment—to prove that K.E.K. was *ever* dangerous to herself or others." This might be a sufficiency-of-the-evidence argument, but it is not an as-applied due process argument.

¶50    Third, K.E.K. argues that WIS. STAT. § 51.20(1)(am) violates substantive due process because it impermissibly "removes the 'recent acts or omissions' requirement from the 5th [§ 51.20(1)(a)2.] standard." Again, this is not an as-applied argument because nothing about it is unique to the proceedings involving K.E.K. Rather, as K.E.K. acknowledges, her third argument applies to

"K.E.K. or anyone recommitted under the 5th standard." As a facial challenge, we have already resolved this topic.[12]

## II. The Involuntary Treatment And Medication Order

¶51 Having addressed K.E.K.'s arguments about the recommitment order, we now turn to the order for involuntary treatment and medication. K.E.K. makes three arguments under the heading "[t]here was insufficient evidence to support the circuit court's involuntary treatment order." It does not appear to us that all three are sufficiency-of-the-evidence-arguments. But, labeling aside, we attempt to address these three arguments as best we understand them.

### A. Alleged Failure Of Circuit Court To Identify The Subsection

¶52 K.E.K. argues that the circuit court, in imposing the involuntary medication order, improperly failed to identify whether the court was relying on WIS. STAT. § 51.61(1)(g)3m. (involuntary treatment for individual committed under fifth standard of dangerousness) or § 51.61(1)(g)4. (involuntary treatment for individual committed under a dangerousness standard other than the fifth standard, or while a petition for such a commitment awaits final determination). The court's written order includes the findings that K.E.K. is mentally ill and that she "is substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to [her] condition in order to make an informed choice as to whether to accept or refuse psychotropic medications."

---

[12] We agree with K.E.K. that the County's reliance on *Terry R.H. v. Marathon Cty.*, No. 1994AP2097, unpublished slip op. (WI App Mar. 14, 1995), is improper. Although this unpublished opinion is authored, it pre-dates July 1, 2009. Therefore, with exceptions that do not apply here, it falls within the rule that such decisions may "not be cited in any court of this state as precedent or authority." *See* WIS. STAT. RULE 809.23(3).

¶53     As an initial matter, we question whether K.E.K. preserved this issue for appeal. We see no place in the record at which K.E.K.'s counsel argued that something more was required than the findings in the standard order form used by the circuit court. Accordingly, it appears that this challenge has been forfeited.

¶54     More importantly, K.E.K. fails to explain why it matters that the court failed to specify whether it was relying on WIS. STAT. § 51.61(1)(g)3m. or § 51.61(1)(g)4. K.E.K.'s entire argument on this topic is as follows:

> The circuit court's first error in ordering involuntary medication and treatment for K.E.K. came when it failed to identify which statutory subsection it was applying— §51.61(1)(g)3m or §51.61(1)(g)4. The two overlap, but they are not identical. [*Outagamie Cty v.*] *Melanie L.*, [2013 WI 67,] ¶¶61-63, [349 Wis. 2d 148, 833 N.W.2d 607.] Section 51.61(1)(g)3m, which incorporates the 5th standard, imposes many more requirements and is thus much stricter.

K.E.K. makes no attempt to explain how § 51.61 interacts with WIS. STAT. § 51.20(1) and she does not specify the "many more requirements" or why they might matter. Accordingly, we reject the argument as undeveloped.

## B.  Alleged Failure Of Circuit Court To Identify Evidence

¶55     K.E.K. argues that the circuit court failed to identify the evidence that it relied on or to give a reason for ordering involuntary medication. The County notes that the court made some findings regarding K.E.K.'s medication history following her initial commitment, but concedes that the court "did not go into further detail concerning the statutory criteria concerning a medication order." However, the County relies on the well-established rule that "[w]hen a court does not expressly make a finding that is necessary to its decision, we may assume it made that finding, and we review the record to determine if the presumed finding

22

is clearly erroneous." *Gittel v. Abram*, 2002 WI App 113, ¶49, 255 Wis. 2d 767, 649 N.W.2d 661. K.E.K. does not develop a rebuttal to this point, conceding it.

*C. Alleged Failure Of Circuit Court To Recognize The Absence Of Evidence*

¶56    K.E.K. argues that the circuit court failed to "recognize the absence of clear and convincing evidence to support an involuntary treatment order under either [WIS. STAT. §] 51.61(1)(g)3m. or §51.61(1)(g)4." We assume that K.E.K. means to argue that the evidence is insufficient to satisfy either § 51.61(1)(g)3m. or § 51.61(1)(g)4.b.

¶57    In part, K.E.K. asserts that the "County had to demonstrate, at a minimum, [that she had a] history of noncompliance with taking prescribed medication." The only support K.E.K. provides for this requirement is to cite *Melanie L.*, 349 Wis. 2d 148, ¶¶75-78, 97. We find no such requirement in those paragraphs. *Melanie L.* does explain that an individual's history of noncompliance is relevant, *see id.* ¶75, but it does not say that proof of prior noncompliance is required.

¶58    K.E.K. also asserts that the County was required to prove that she had an "inability to apply the advantages and disadvantages of treatment to her own condition." We understand this to be an assertion that the evidence was insufficient to support the circuit court's written finding that K.E.K. was "substantially incapable of applying an understanding of the advantages, disadvantages and alternatives to ... her condition in order to make an informed choice as to whether to accept or refuse psychotropic medications."

¶59    This argument is undeveloped. She does not summarize the evidence most favorable to the circuit court's finding and then explain why that

evidence is insufficient. Instead, in a few sentences unsupported by record citations, K.E.K. briefly summarizes limited testimony that, viewed in isolation, might support a finding that she did have the sort of understanding needed to make an informed choice about medication. And even this limited discussion is flawed. We give examples of both problems.

¶60 First, K.E.K. asserts that "Dr. Bales admitted that [K.E.K.] *had* at least a 'superficial understanding' of the advantages, disadvantages and alternatives to treatment." (Emphasis added.) Although K.E.K. does not supply a record citation with this assertion in her argument section, this appears to be a reference to a factual summary in the background section of her brief in which she cites to page 19 of the trial transcript. Looking there, we conclude that K.E.K.'s assertion is misleading. Dr. Bales did not say that K.E.K. "had" a superficial understanding. Rather, he agreed that K.E.K. was able to "express" an understanding—something very different. *See Melanie L.*, 349 Wis. 2d 148, ¶¶53-55 (explaining distinction between a subject's ability to express understanding of recommended medication and subject's ability to apply that understanding to subject's circumstances). More importantly, Dr. Bales went on to opine that K.E.K. could not apply any understanding that she did have in order to make an informed medication choice.

¶61 Second, K.E.K. asserts that "the County did not offer any *admissible* evidence of K.E.K.'s noncompliance with prescribed medication." (Emphasis added.) K.E.K. does not explain her qualifier "admissible." In particular, she does not explain why the testimony of Dr. Bales that K.E.K. had a history of noncompliance with her medications was inadmissible.

¶62    Third, K.E.K.'s failure to come to grips with testimony that supports the circuit court's finding includes testimony by Dr. Bales that K.E.K. did not understand her mental illness. This also includes testimony by K.E.K.'s case manager, Heather Van Kooy. Van Kooy testified that, based on her monthly interactions with K.E.K. and K.E.K.'s "history [with] our department," K.E.K. "will no longer take her medications, become more unstable, and potentially [become] a danger to herself" if she no longer receives "the treatment and care that she's receiving currently."

### *Conclusion*

¶63    For these reasons, we affirm the circuit court.

*By the Court.*—Order affirmed.

Not recommended for publication in the official reports.